## IN RE GEORGE E. RITTER, A LUNATIC.

*Wills—Charge of Support—Release of Devisee.*

Where a devise has annexed thereto a condition subsequent requiring the devisee to care for and provide on the land devised a home for an invalid brother, the land remains subject to the charge into whosever hands it passes.          p. 137

Where a provision in a will required the devisee of testator's home farm to provide a home for his lunatic brother, "to be

kept and provided for at home on the place where I now live,"
the lunatic's right to care, board, and maintenance was indi-
visible from his right to a home on the farm, and there was no
default by the owner of the farm, or liability on his part for the
support of the lunatic, if support on the farm was impossible
by reason of the lunatic's enforced confinement in an asylum,
after inquisition by a jury and commitment by a court, until
his death.                    .          pp. 138, 139

*Decided April 9th, 1925.*

Appeal from the Circuit Court for Baltimore County, In
Equity (HARLAN, J.).

Petition by Belema A. Henderson and her husband, Hugh
L. Henderson, administrators, in proceedings concerning
George E. Ritter, a lunatic. From a decree in favor of said
petitioners, J. Fred Owings, committee of said lunatic, ap-
peals. Reversed.

° The cause was argued before BOND, C. J., PATTISON, UR-
NER, ADKINS, DIGGES, PARKE, and WALSH, JJ.

*Redmond C. Stewart* and *William L. Henderson,* with
whom were *H. Courtenay Jenifer* and *Stewart & Pearre,*
on the brief, for the appellant.

*Thomas Mackenzie* and *Elmer J. Cook,* for the appellee.

PARKE, J., delivered the opinion of the Court.

Sidney M. Ritter lived in Baltimore County on her small
farm, with her husband and family. It was a leasehold
property of about nineteen acres and three roods, subject to
a ground rent of one cent, which apparently has not been
paid for many years, so we shall speak of the property as
freehold for the purposes of this opinion. Mrs. Ritter died
in 1868 and devised and bequeathed the farm and the stock
and farming implements to her surviving son, Howard T.
Ritter, on conditions subsequent which were stated in this

form by the will: "the said Howard T. Ritter is to pay my oldest son, John T. Ritter, the sum of ($300.00) three hundred dollars within six years from the date of my death, and he the said Howard T. Ritter is to take care of and provide a home for his brother, George E. Ritter, who is a lunatic, as long as he lives, to be kept and provided for at home on the place where I now live, and he the said Howard T. Ritter is to take care of and provide a home for his afflicted brother, Hiram A. Ritter, also to take care of and provide a home for his aged father, Thomas Ritter, during his life." This quotation embraces everything in the will that has any bearing on the questions here.

The devisee of the farm accepted the gift, lived on it, and discharged his obligations until his death on October 31st, 1887, when he gave by his will the farm and the stock and the farming implements to William Howard Owings. The devise of the farm, so far as it reflects on the question involved on this appeal, read thus:

"Item.   I give, devise and bequeath unto my nephew, Wm. Howard Owings, son of Henry Owings, and now a resident of Baltimore City, my farm and premises on which I now dwell situated in the Second District of Baltimore County, Maryland, and containing $19\frac{3}{4}$ acres of land, more or less, it being the same piece or parcel of land that was conveyed to me from my mother, Sidney M. Ritter, by will dated on the first day of April, 1867, to him the said Wm. Howard Owings, his heirs and assigns, in fee simple; to have and to hold the same, subject to the following conditions and qualifications, viz: He shall take my place and stead, and do what I am required and held to do under and by the provisions of my mother's will aforesiad, in providing and caring for my two brothers, George E. Ritter and Hiram A. Ritter."

William Howard Owings took possession of the farm under the will, and now holds it. George E. Ritter and Hiram A. Ritter both survived their brother, Howard T. Ritter.

In 1901, a bill of complaint for an accounting was filed by Hiram A. Ritter in his own name and in the name of his insane brother, George E. Ritter, against William Howard Owings, charging that George E. Ritter had been placed on October 13th, 1886, in the Maryland Hospital for the Insane, where he remained as an insane pauper; and that Hiram A. Ritter had been forced on March 22nd, 1901, to leave his home on the farm because of cruelty of treatment by Owings, who was alleged to have failed to provide him with food and clothing so that he was driven to rely upon charity for his home and support. The defendant denied the allegations on February 5th, 1902; and, pending the proceedings, Hiram A. Ritter died. Carville D. Benson became his administrator, and the court passed a decree on January 23rd, 1904, directing that the defendant and his wife pay to the administrator the sum of two hundred dollars and the funeral expenses, and the further sum of one hundred and twenty-five dollars as counsel fees for solicitors for complainants and the costs; and dismissing the bill upon the payments being made. Nothing was awarded to the co-plaintiff, the lunatic, the sums named were paid, and the bill was dismissed.

On the dismissal of this bill, the lunatic, George E. Ritter, was the surviving beneficiary under the will of Sidney M. Ritter, and he was incurably insane in an asylum where he was maintained at the expense of the State.

The mother in her will called George E. Ritter a lunatic, and he was found by inquisition had in the Circuit Court for Baltimore County, to be an insane pauper, and, accordingly, on November 11th, 1886, was committed to Spring Grove State Hospital, from which he escaped on July 12th, 1887. He returned to the farm, where he was given a comfortable home and clothed and fed until in July, 1888, he voluntarily left, completely disappeared and was at large until July 3rd, 1891, when he came back to the farm. He was again given a home, fed and clothed, and the affirmative, positive proof is that William Howard Owings continued

fully to perform and discharge all his obligations to the lunatic until, without his instigation or knowledge and in his absence, the law officers came and took him back to the State asylum, to which he was committed but from which he had escaped.

The testimony of Dr. Percy J. Wade, the alienist and superintendent of Spring Grove State Hospital, where Ritter came under his personal observation, was to the effect that it was not safe for Ritter to be at large and that it was necessary to keep him confined all the time in a hospital for the insane. There is not a particle of evidence offered in contradiction, and, on the other hand, the instances of misconduct,—of attack upon the daughter and wife of Owings, threats of violence and to kill, and, on one occasion, of an actual attempt on the life of a neighbor with a loaded shotgun,—which were narrated in the proof, without any attempt at palliation or denial, afford convincing illustration that the confinement in an insane asylum was necessary. The record is persuasive that it would have been an injustice to Ritter not to have put and kept him where he would at once be prevented from doing injury to others and, in physical ease and comfort, be cared for, waited on and nursed with a skill and attention which was wholly beyond any possible performance or obligation on the part of Owings.

The lunatic was kept as a public patient in Spring Grove State Hospital until he died, on January 11th, 1918. Owings paid the funeral expenses, but beyond visiting him and taking or sending him quite frequently delicacies, he contributed nothing to the expense of his maintenance at the hospital.

One other phase requires statement. In 1911, William Howard Owings desired to borrow $1,000 of Redmond C. Stewart, trustee, to be secured by a mortgage on the farm. When the title was examined the provision with respect to George E. Ritter was discovered, the circumstances were investigated, and, when it was found that George E. Ritter

was an old man, hopelessly and violently insane, and committed to a public institution, it was determined to accept the farm as security for the loan, but, in order to remove any doubt as to the title, Mr. Stewart frankly said that he had advised the institution of proceedings for the appointment of a committee of the person and property of the lunatic in order that a release might be obtained of the personal right of the lunatic to have a home and maintenance on the farm. Accordingly, some three weeks after the making of the said loan and mortgage, a petition was filed on March 18th, 1911, for the writ de lunatico inquirendo, and the usual order and proper service of process upon the lunatic were had. On petition, the court excused the personal attendance of the lunatic, an inquisition was returned confirmed, and eventually J. Fred Owings was appointed and qualified as committee.

The petition for writ de lunatico inquirendo was accompanied by an affidavit of Dr. J. Percy Wade, the superintendent of Spring Grove Asylum, where Ritter had been continuously confined since April 29th, 1892, to the effect that he had known the lunatic for eighteen years, and that during this period he had been and was of unsound mind. The inquisition returned by the sheriff showed that the jury had found that, for more than twenty years, Ritter had been a lunatic, without lucid intervals, and incapable of the government of himself or the management of his property; and, further, that his estate consisted of an interest in the farm under the will of his mother, Sidney M. Ritter, "being the right to make a home on said piece of property, but the amount and value thereof they are unable at this time to ascertain." The committee's report and petition to the court fully set out the provisions under the wills of Sidney M. Ritter and of Howard T. Ritter under which the lunatic's right arose; and referred to the equity cause of Hiram A. Ritter and George E. Ritter against William H. Owings, and stated the effect of the decree, and prayed that all the proceedings in that cause be taken as a part of

the report.   After this informative narrative, the committee averred that he had been advised that the lunatic had "a personal right to make a home on the aforesaid land, if he were in a physical condition which would enable him to make his home there, but that the said George E. Ritter has on account of his physical condition for the last twenty years been confined in the Maryland Hospital for the Insane, and is now a man of upwards of seventy years of age, and in poor health, and it is extremely improbable that he will ever attain such physical condition as will allow him to leave the said institution where he is now, and has been as aforesaid for many years, a charge on Baltimore County," and represented to the court the advisability of attempting to dispose of the interest of the lunatic in the farm for his support or for the payment of the costs and expenses of the lunacy proceedings incurred by the committee.   Bagby's Code 1924, art. 16, sec. 125; *Rutledge v. Rutledge,* 118 Md. 557, 561.   The court, on this verified petition and report, authorized the committee to make sale of the interest and estate of the lunatic in the farm at private sale and to report "all offers he may receive for the said interest to this court for its further consideration."   The committee reported under oath to the court an offer from William Howard Owings of $75 for a release of all the interest of the lunatic and of the committee in the farm.

The reasons given by the committee for the acceptance of this offer were, in effect, that he had been advised that the interest of the lunatic had been intended to have been satisfied by the decree and dismissal of the equity cause of Hiram A. Ritter and George E. Ritter against William H. Owings, and that he had no other interest in the farm than his right to make his home on the farm and while there to be supported, which, in the opinion of the committee, he would never be able again to enjoy by reason of his age and of the nature of his affliction; and that the offer of the owner of the land was the only way of realizing on this possibility.

The court ordered the offer to be accepted and the release to be executed on the payment of the consideration, which the committee was directed to apply to the payment of the costs of the proceedings, and the balance, if any, to pay to the County Commissioners of Baltimore County towards the support and maintenance of the lunatic. The purchase money was paid to the committee, who gave the deed of release to William Howard Owings on May 1st, 1911.

The lunatic remained at the hospital, where he died on January 11th, 1918, without any property. His sister, Mrs. Belema A. Henderson, with her husband, Hugh L. Henderson, procured letters of administration on November 17th, 1923, in order to institute the present proceedings, which were begun by their petition filed in the lunacy proceedings on December 15th, 1923.

The petition was grounded on the allegations: (1) that William Howard Owings had permitted the lunatic to be committed to the hospital as an insane pauper, and had "made no effort to care for or provide a home for the said George E. Ritter upon the said home place, as required by the will of the said Sidney M. Ritter;" (2) that the court, without taking testimony as to the value of the interest of Ritter in the farm, or the necessity for its sale, passed an *ex parte* order authorizing the sale; that the committee made the sale for a grossly inadequate price, without sufficiently striving for a better one; (3) that the lunacy proceedings were not begun "for the benefit of the said lunatic, but was the carrying out of a preconceived plan by the said William Howard Owings to procure the sale to himself for an inadequate consideration of the interest and estate of the said George E. Ritter, a lunatic, in the said land devised as aforesaid by the latter's mother, Sidney M. Ritter, for the support and maintenance of her said lunatic son"; that the said William Howard Owings in thus making the purchase and obtaining the release was not acting in good faith, but in violation of his obligations, so that to allow it to stand would be a fraud upon the estate of the said lunatic; and

that the administrators had not learned of the institution of the lunacy proceedings and the execution of the release until within a month before the filing of their petition. The relief sought was the rescission of the orders of court authorizing the sale and of the deed of release.

An order *nisi* was passed and served on the committee to show cause why the prayer of the petition should not be granted. On his appearance, the committee demurred, and the court sustained a demurrer on the single ground of non-joinder of parties defendant. As the court suggested, William Howard Owings and Redmond C. Stewart, trustee, were made parties defendant with J. Fred Owings, committee. The new parties answered and then withdrew their answers and demurred. Their demurrers were overruled, and they refiled their answers, and testimony was taken in open court, with the result that the court adjudged, on September 17th, 1924, that the order of April 17th, 1911, and of April 19th, 1911, authorizing respectively the sale of the lunatic's interest in the farm and accepting the offer of William Howard Owings, be rescinded, and that the release to William Howard Owings by the committee be annulled. J. Fred Owings, committee, took an appeal from this decree.

The chancellor regarded the thirteen year old action of his associate in authorizing and ratifying the sale of the interest of the lunatic in the farm, and of decreeing the deed of release to William Howard Owings, as having been improvidently taken and without the court having been advised that the proceedings had their origin in a desire to have the land released of any charge under the will of Sidney M. Ritter. He also considered that the application for sale came within the provision of the Code requiring proof to be taken before decree of the value, quantity and condition of the property. Bagby's Code 1924, art. 16, sec. 121. But see section 125; *Rutledge v. Rutledge,* 118 Md. 557, 561. On these, as well as the other points raised by the

demurrer, it is unnecessary to express an opinion, as the decree must be reversed on another ground.

The petition of the administrators obviously was but an opening movement, which was necessary to clear the way to surcharge the committee with the value of the support which William Howard Owings did not give to the lunatic by reason of his being confined as an insane pauper in a State institution at the public expense. On the death of the lunatic, William Howard Owings was freed, and so was the farm, and so was the committee, unless the release of 1911 could be set aside.

If we assume, as we shall, that the sale and release had never been made, neither the lunatic nor his committee could assert a claim against the land or its owner, nor could the appellees surcharge the committee unless the lunatic had been deprived of some right which gave him a demand against William Howard Owings for compensation. The obligations of Owings arose because he had accepted the gift by will from Howard T. Ritter, who, as a condition of that gift, had substituted him in the place of Ritter in the performance of the conditions subsequent which had been imposed upon Ritter by the devise of the farm to him by Sidney M. Ritter. The measure of Howard T. Ritter's obligations was, therefore, the measure of those of William Howard Owings, and so must be sought in the terms of the will of Sidney M. Ritter.

With respect to the question now before this Court, the condition subsequent created by the devise of Sidney M. Ritter to Howard T. Ritter of the farm of nineteen and three-fourths acres, more or less, was thus expressed: "He, the said Howard T. Ritter, is to take care of and provide a home for his brother, George E. Ritter, who is a lunatic, as long as he lives, to be kept and provided for *at home on the place where I now live.*"

Under the uniform decisions of this Court, the will of Sidney M. Ritter devised the farm to Howard T. Ritter, subject to the charge upon the property of the burden of

providing the lunatic, George E. Ritter, with a home on the farm, where he was to be kept, cared for and maintained during his life, and the farm remained subject to this charge, no matter into whose hands it passed. *Tolson v. Tolson,* 10 G. & J. 159, 175, 8 G. 376; *Willett v. Carroll,* 13 Md. 459, 466, 468; *Donnelly v. Edelin,* 40 Md. 117, 121; *Meakin v. Duvall,* 43 Md. 372, 378; *Ogle v. Tayloe,* 49 Md. 159, 176; *Gardenville etc. Assn. v. Walker,* 52 Md. 452, 454; *Downes v. Long,* 79 Md. 382, 387; *Buchanan v. Lloyd,* 88 Md. 642, 651.

The will in the instant case explicitly stipulated that the beneficiary was "to be kept and provided for at home on the place where I now live." It is clear that the right to care, board, and maintenance was not separate and distinct from the right to a home on the farm, but was indivisible therefrom, and depended, therefore, upon the continuance of the beneficiary's residence in the home on the farm. Not only does the language of the particular gift carry this meaning, but it is a construction in harmony with the context, and also finds support in the subject matter, which was a small farm of but nineteen acres and three roods, more or less. If the beneficiary should be deprived of the privilege of the home, with its accompanying rights of care, board, and maintenance, by or through the act or default of the devisee or his successor in title to the farm, the beneficiary would be entitled to a commutation or a money charge in lieu of the enjoyment of the denied privileges. *Meakin v. Duvall,* 43 Md. 372, 378, 380; *Lewin on Trusts,* 126.

On the other hand, if the beneficiary should voluntarily abandon his residence on the farm or be absent under the compulsion of legal process, which prevented both the lunatic, while thus absent, from enjoying, and the then owner of the farm from discharging, the privileges and obligations created by the provisions of the will, there can be no commutation. Compensation can only be awarded for a default on the part of the owner of the farm, and he is not guilty of

any default, where the performance of his obligations is contingent on the living of the beneficiary in the home on the farm, so long as performance by the owner has been rendered impossible through and during an absence of the other party that is not attributable to the owner's act or fault. By the terms of the will, reasonably interpreted, it was not contemplated by the testatrix that the owner of the land should be chargeable for absence, which might arise by act of God or of law or of the beneficiary. *Supra. Meakin v. Duvall,* 43 Md. 372, 378, 380, 381; *Addison v. Bowie,* 2 Bland 606, 626; *Donnelly v. Edelen,* 40 Md. 117; *Crise v. Lanahan, (Md.),* 11 Atl. 842, 845, 846 (Unreported case, Oct. Term, 1887); *Thomas v. Howell,* 1 Salk, 170; *Hammond v. Hammond,* 55 Md. 575, 582; *Baily v. DeCrespigny,* L. R. 4 Q. B. 180; *People v. Ins. Co.,* 91 N. Y. 174, 178; *Lynch v. Melton,* 150 N. C. 595, as reported and annotated in 27 L. R. A. (N. S.), pp. 684, 689; *People v. Manning & Condit,* 8 Cowen (N. Y.) 297, 299, citing Co. Litt. 206a.

The testatrix died in 1868, when George E. Ritter was a youth. From that date until 1886 he had a comfortable home on the farm, although he had become dangerous and a menace to the neighborhood. His misconduct culminated in an attempt to murder a neighbor, Harry L. Fryfogle, who was saved by his brother seizing the loaded double-barreled shot gun and disarming the maniac. As a result of this crime, an inquisition was held, and the jury found him insane, and he was committed to a public institution for the insane on November 11th, 1886. He escaped on July 12th, 1887, and returned to the farm, where he was received and taken care of until he wandered off in July, 1888, and completely disappeared until July 3rd, 1891, when he again appeared at the farm. He was again taken care of and given a home, but he alarmed the neighborhood by his threats and conduct, and his assaults on Mrs. Owings and her daughter, so that a constable, in the absence of William Howard Owings, and without his knowledge or participation, arrested the lunatic on July 11th, 1918, and placed him back in the in-

stitution to which he had been committed and from which
he had escaped. Dr. Wade's testimony was that it was un-
safe for him to be at large and he was confined to the hos-
pital until his death. The appellees submitted no proof
whatsoever that the original devisee of the farm or the suc-
cessor in title, William Howard Owings, had denied to the
lunatic a single one of his privileges under the will. On the
contrary, the testimony is direct, convincing and uncontra-
dicted that the beneficiary had at all times, while on the
farm, and awaiting him when away on his wanderings or at
the asylum, a suitable and comfortable home, with good and
sufficient care, board and maintenance, until the release exe-
cuted by the committee to William Howard Owings on May
1st, 1911. But after that date the lunatic continued unfit
to be at large and remained in the State asylum for the in-
sane until his death. At no time was the lunatic in a con-
dition or able to present himself to the owner for lodging,
boarding and maintenance on the farm. This situation has
arisen through no default of the land-owner.

Without dwelling further on the facts, the lunatic was
committed by the State to a public institution for the in-
sane on November 11th, 1886, and was never permitted to
leave on account of his dangerous condition. His absence
was due to his escape; his arrest and return were while he
was still a fugitive, and his renewed incarceration until his
death was because the State did not set him free. His con-
finement was, therefore, occasioned by his mental disorder
assuming a permanently dangerous form, which was an act
of God; and was the result of the finding of a jury under
an inquisition of the Circuit Court for Baltimore County
in 1886 and a commitment by that court, which was an act
of law. The State had the lunatic in its care for public
safety, and Owings was under no duty to attempt to obtain
the release of the lunatic, nor under any obligation to con-
tribute to the lunatic's support while in the custody of the
State. *Meakin v. Duvall*, 43 Md. 372, 378, 380.

Entertaining these views of the facts on the record, the

court can see no ground for the intervention of the appellees in the cause, and their petition should be dismissed. It is not necessary to prolong this opinion, as this conclusion makes the other questions raised unimportant on this appeal. The decree below will be .reversed, and the cause remanded for a decree in conformity with this opinion.

> *Decree reversed, with costs to the appellant, and cause remanded for a decree in conformity with this opinion.*